UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ERIN WEBER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| THE GUARDIAN LIFE INSURANCE | ) |
| COMPANY OF AMERICA, | ) |
| | ) |
|     Defendant. | ) |

**COMPLAINT**

COMES NOW Plaintiff, Erin Weber, and for her claims and causes of action against Defendant, The Guardian Life Insurance Company of America, states as follows:

PARTIES

1. Erin Weber ("Weber") is a resident and citizen of the State of Missouri.

2. Defendant The Guardian Life Insurance Company of America ("Guardian") is an out-of-state insurance company authorized to do business in the State of Missouri. The Commissioner of the Missouri Department of Insurance is authorized to accept service of process on behalf of Guardian.

JURISDICTION AND VENUE

3. Weber brings her claim pursuant to the Employment Retirement Income Security Act ("ERISA") and 29 U.S.C. § 1001 *et seq.*

4. This dispute is governed by a welfare benefits plan and its policy documents, as well as applicable federal law regarding employer provided benefits. 29 U.S.C. § 1132(e)(1).

5. This Court also has subject matter jurisdiction pursuant to the general jurisdictional statute for civil actions arising under federal law. 28 U.S.C. § 1331.

6. Venue lies in the Western District of Missouri under 29 U.S.C. § 1332(e)(2), as the breach occurred in this district, and because the welfare benefits plan is administered in this district.

7. Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this action occurred within this judicial district.

## INFORMATION REGARDING TRIAL

8. No jury trial is allowed under ERISA law.

## STATEMENTS OF FACT

9. Weber was employed full-time as a schoolteacher at the Ewing Marion Kauffman School. ("EMKS")

10. As a result of her impairments, Weber was unable to continue working. In July 2021, Weber stopped working as a 9th grader teacher at EMKS.

11. Weber has been diagnosed with the following impairments:

    a. ADHD, combined type;
    b. Chronic Fatigue Syndrome;
    c. Irritable Bowel Syndrome ("IBS");
    d. Small Intestine Bacteria Overgrowth ("SIBO");
    e. Vasomotor (Nonallergic) Rhinitus;
    f. Fibromyalgia Primary;
    g. Generalized Anxiety Disorder;
    h. Major Depression Recurrent Moderate;
    i. Migraine Headache with Intractable Migraine without Status Migrainosus, and;
    j. Likely endometriosis.

12. EMKS sponsored a group long-term disability ("LTD") benefits plan ("Plan") for its participating employees.

13. The Plan constitutes employee welfare benefit plans as defined by 29 U.S.C. § 1002(1).

14. The Plan offered disability benefits to qualifying EMKS's employee plan participants.

15. At all relevant times, Weber has been a participant and covered person in the administrator of the Plan.

16. Guardian is the administrator of the Plan.

17. EMKS delegated or attempted to delegate the function of issuing LTD claim determinations to Guardian.

18. EMKS and Guardian entered into an administrative services contract through which EMKS paid Guardian for acting as claims administrator.

19. On August 10, 2021, after a two day stay in the hospital, Weber visited with Dr. Gary Thompson, M.D., to get her Family Medical Leave Act ("FMLA") paperwork filled out.

20. On or about August 25, 2021, Weber initiated her LTD claim with Guardian.

21. On or about August 30, 2021, an Attending Physician's Statement was completed by Dr. Thompson. Dr. Thompson advised that Weber's symptoms started in January 2021 and that Weber was hospitalized for the period of July 22, 2021, through July 24, 2021. Dr. Thompson advised that Weber suffered from extreme fatigue, exhaustion, and poor tolerance for activities of daily living due to suspected chronic fatigue. Dr. Thompson also concluded that Weber additionally had diagnoses of myalgia encephalomyelitis (chronic fatigue syndrome) and fibromyalgia causing extreme fatigue and brain fog. Dr. Thompson indicated that Weber had no work capabilities due to her inability to exert

herself due to her medical condition. Dr. Thompson, additionally, concluded that the duration of Weber's restrictions was lifelong.

22. On or about October 12, 2021, Guardian communicated its denial based on its conclusion that "the medical information did not demonstrate that [Weber's] reported symptoms of extreme fatigue cause restrictions and/or limitations." Guardian further maintained that Weber was "capable of performing the majority duties of [Weber's] own occupation" and that therefore she did not meet the Policy's definition of "disability."

23. On November 5, 2021, Weber saw Dr. Jorge Kawano-Castillo, MD for an evaluation due to fatigue. On physical exam, Dr. Kawano-Castillo found mild distal sensory loss to temporal in bilateral lower extremities and variable or distractable tremors. Weber reported that she had been using a walker since last June due to tiredness.

24. On November 8, 2021, Weber was seen by Dr. Omar Jawdat, MD, for an EMG to evaluate paresthesias.

25. On November 18, 2021, Weber was seen for a follow-up with Dr. Kawano-Castillo. Weber underwent electrodiagnostic studies which came back normal.

26. On December 3, 2021, Weber presented to Dr. Jorge Kawano-Castillo, MD for a brain MRI.

27. On December 6, 2021, Weber saw Dr. Thompson to do a follow-up. Dr. Thompson noted that Weber was to see rheumatology, infectious disease, and gastroenterology due to a change in stool with mucus and blood.

28. On December 8, 2021, Weber saw Dr. Valerie Wood, MD/ENT. Weber reported that she had a sinus congestion and an endoscopy was completed finding a left deviated septum.

29. On January 4, 2022, Weber again saw Dr. Thompson and noted that she had to travel to Arizona for a wedding and had to use a wheelchair in the airport because she was unable to walk.

30. On January 19, 2022, Weber saw Dr. Valerie Wood, MD. Weber reported that she still suffered from headaches, but that she was going to see Neurology for evaluation and treatment.

31. On January 28, 2022, Weber presented to Dr. Kristen Pope, MD for a chest x-ray and a Pulmonary Function Lab.

32. On February 8, 2022, Weber saw Dr. Thompson for a follow-up.

33. On February 16, 2022, Weber saw Dr. Laura Thomas MD for a Cardiopulmonary Exercise Test demonstrating abnormally low anaerobic threshold, and low $CO_2$ in her blood.

34. On March 9, 2022, Weber presented to Dr. Brewer for a Hydrogen Breath Test indicating Smal Intestinal Bacterial Overgrowth, a condition that is linked by recent medical research to chronic fatigue syndrome.

35. On March 11, 2022, Weber had a follow-up with Dr. Jorge Kawano-Castillo. Dr. Kawano-Castillo reported that Weber primarily complained that her "symptoms have increased in the past few months."

36. On March 11, 2022, Weber was seen for a follow-up due to headaches. Weber reported that weather changes could trigger her headaches. Weber reported "four episodes per week and were overall worse recently."

37. On April 6, 2022, Weber submitted her LTD appeal.

38. On April 15, 2022, Guardian acknowledged they received the LTD appeal.

39. Weber's occupation is appropriately classified as a light work job per the Dictionary of Occupational Titles.

> **TITLE(s): TEACHER, SECONDARY SCHOOL (education)** alternate titles: high school teacher
>
> Teaches one or more subjects to students in public or private secondary schools: Instructs students, using various teaching methods, such as lecture and demonstration, and uses audiovisual aids and other materials to supplement presentations. Prepares course objectives and outline for course of study following curriculum guidelines or requirements of state and school. Assigns lessons and corrects homework. Administers tests to evaluate pupil progress, records results, and issues reports to inform parents of progress. Keeps attendance records. Maintains discipline in classroom. Meets with parents to discuss student progress and problems. Participates in faculty and professional meetings, educational conferences, and teacher training workshops. Performs related duties, such as sponsoring one or more activities or student organizations, assisting pupils in selecting course of study, and counseling student in adjustment and academic problems. May be identified according to subject matter taught. May be required to hold certification from state.

40. The above occupation is classified at the "light" physical level, which the United States Department of Labor characterizes as follows:

> **Light Work**
> Light Work involves exerting up to 20 pounds of force occasionally or up to 10 pounds of force frequently, or a negligible amount of force constantly to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job/occupation is rated Light Work when it requires: (1) walking or standing to a significant degree; (2) sitting most of the time while pushing or pulling arm or leg controls; or (3) working at a production rate pace while constantly pushing or pulling materials even though the weight of the materials is negligible. (The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.)

41. The Plan defines "Disability" or "Disabled:

> **Disability or Disabled:**
>
> These terms mean that a current Sickness or Injury causes impairment to such a degree that You are:
>
> - Not able to perform, on a Full-Time basis, the major duties of Your Own Occupation during the Elimination Period and the Own Occupation period.
>
> - Not able to perform, on a Full-Time basis, the major duties of any Gainful Work after the end of the Own Occupation period.

42. The major duties of Weber's occupation can be rightfully categorized as light but teaching 9th grade in high school also comes with additional demands. Such a teaching position at a successful publicly-funded charter school, well-known in the community for academic achievements, would also require significant mental, cognitive, and memory

skills. A teacher in this position would be required to resolve conflict between 9th graders and also be able to re-direct the class after moments of distraction. From the perspective of a person who has never taught, this could aptly be characterized as a "light" physical level occupation. This entry in the Dictionary of Occupational titles ("DOT") was last updated in 1980. This characterization as a "light" physical level occupation does not consider recent changes in the last 42 years since the DOT entry has been updated, such as the George W. Bush-era-Act, the *No Child Left Behind Act of 2001*. This *Act* imposed testing measures be implemented within public school American classrooms and curriculum with few exceptions. In addition to the DOT being outdated, this assertion of a "light" physical level occupation was obviously made by an individual with no teaching experience; teaching a 9th grade classroom is not a "light" occupation.

43. Medical records were furnished to Guardian during the pendency of the LTD claim that evidenced that her primary care physician, Dr. Thompson, believes Weber is disabled. The impairments that Weber has are the type of medical impairments that are very difficult to objectively verify with medical evidence. These medical conditions are not faked, are very tangible to Weber, but Guardian would have us believe Weber is lying and does not suffer from these conditions.

44. Guardian arbitrarily and capriciously determined that Weber's occupation involved only "light" physical demands.

45. Weber supplied sufficient proof of her loss, including but not limited to medical and hospital records, pharmacy records, fully executed claim forms, and an authorization enabling Guardian to obtain without restriction her medical records.

46. Weber has at all relevant times met the definition of "Disability or Disabled" under the Plan and is entitled to benefits.

47. Weber has exhausted her administrative remedies.

## CAUSES OF ACTION

### COUNT I
### 29 U.S.C. § 1132(a)(1)(B) – WRONGFUL DENIAL OF BENEFITS

48. Weber realleges the preceding paragraphs as if fully set forth herein.

49. Weber is entitled to all unpaid and accrued LTD benefits, as Guardian:

    a. Made an unfavorable decision without substantial evidence;

    b. Failed to request or obtain objective evidence relating to Weber's impairments;

    c. Failed to properly consider Weber's medical impairments and resulting limitations; and

    d. Issued an unfavorable decision that was arbitrary and capricious.

50. Pursuant to 29 U.S.C. § 1132(a)(1)(b), Weber is entitled to an award of actual damages for losses suffered.

51. Pursuant to 29 U.S.C. § 1132(g), judgment may include compensation for a beneficiary's attorney's fees, costs, and prejudgment interest.

52. Guardian has not satisfied its obligation to pay Weber's LTD benefits.

53. WHEREFORE, Pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), Weber prays for judgment against Guardian for unpaid LTD benefits, attorney's fees, costs, and prejudgment interest.

### COUNT II
### 29 U.S.C. § 1132(a)(3) – BREACH OF FIDUCIARY DUTY

54. Weber realleges the preceding paragraphs as if fully set forth herein.

55. Under 29 U.S.C. § 1002(21)(A), a fiduciary is one who:

> "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property or such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

56. 29 U.S.C. § 1104(a)(1)(A) describes the fiduciary standard of care:

> "a fiduciary shall discharge her duties with respect to a plan solely in the interest of the participants and beneficiaries and – for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

57. Guardian, the Plan's designated claims administrator, is a fiduciary.

58. Weber participated in and benefitted from the Plan as previously indicated.

59. Guardian's claims management practices are motivated by financial incentives in its administrative services agreement with EMKS.

60. As the payor of benefits and the entity responsible for exercising discretion in claims administration, Guardian operates under an inherent conflict of interest.

61. A higher than marketplace quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008) governs the actions of a fiduciary.

62. Guardian breached its fiduciary duty in:

   a. Communicating that they were investigating the merits of the LTD claim in good faith but, denying Webers' LTD claim for benefits within one month of her application for benefits;

9

b. Actively soliciting statements from physicians and medical reviewers who are paid to produce statements that conclude Weber is not disabled per the policy;

c. Engaging in an inequitable conspiracy to deny LTD benefits to Weber, based on a lack of objective medical evidence, for conditions which are objectively difficult to evidence;

d. Failing to comply with its internal guidelines and claims handling procedures. Its claim handlers did not comply with documented instructions involving the administration of disability claims, including its procedures involving coverage and eligibility determinations; and

e. Acknowledging that Weber's conditions are difficult to objectively verify through medical records and evidence. Guardian still chose to not give adequate weight to statements made by a board-certified physician, Dr. Thompson, regarding Weber's medical conditions and impairments.

63. Guardian denied Weber's LTD benefits for the purpose of elevating its financial interests. In doing so, it breached its fiduciary duties.

64. Guardian failed to discharge its duties solely in the interests of its participants and beneficiaries. It acted with both a conflict of interest and breached its fiduciary duty to both Weber and the Plan's participants and beneficiaries generally.

65. Guardian's improper conduct demonstrates that ordinary relief under § 1332(a)(1)(B) is not an adequate remedy.

66. Guardian's violations of regulations alone allow Weber the right to pursue any remedy under Section 502(a) or ERISA, including § 1332(a)(3). 29 C.F.R. § 2560.503(1)(2)(i).

67. Guardian's violations of federal regulation also subject its decision to *de novo* review.

68. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(3), §1109, and § 1132(a)(2), Weber prays for an order that Guardian retrain its employees consistent with ERISA fiduciary obligations and federal regulations; for reformation of its services agreement with the plan administrator consistent with ERISA fiduciary obligations and federal regulations; for an injunction preventing further unlawful acts by Guardian in its fiduciary capacity; for an equitable accounting of benefits that Guardian has withheld; for the disgorgement of profits enjoyed by Guardian in withholding benefits; for restitution under a theory of surcharge; for the Court's imposition of a constructive trust; for an aware of attorney fees; and for further relief as the Court deems just.

Respectfully submitted,

BURNETTDRISKILL, Attorneys

By: /s/ Paul J Taylor
Paul J. Taylor, Mo. # 72159
Derrick A. Pearce, Mo. # 42793
Kyle H. Sciolaro, Mo. # 64568
103 W 26th Ave., Ste. 290
North Kansas City, MO 64116
P: 816.883.4142
F: 816.792.3634
ptaylor@burnettdriskill.com
dpearce@burnettdriskill.com
ksciolaro@burnettdriskill.com
ATTORNEYS FOR PLAINTIFF